**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**EMMERICH NEWSPAPERS, INC.** **PLAINTIFF**

**v.** **CASE NO: 2:26-CV-00057-TBM-RPM**

**GOOGLE LLC** **DEFENDANT**

---

# DEFENDANT GOOGLE LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO TRANSFER VENUE

---

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

I. Emmerich's Allegations ........ 2

II. Emmerich Has Used Google's Services, Whose Terms of Service Require Disputes to Be Litigated in California. ........ 3

ARGUMENT ........ 7

I. Emmerich's Claims Fall Within the Scope of the Mandatory Forum-Selection Clauses in Google's Agreements. ........ 8

A. The Claims Are Well Within the Scope of the Agreements. ........ 9

B. The Forum-Selection Clauses Are Mandatory. ........ 10

II. The Forum-Selection Clauses Are Enforceable. ........ 11

III. Emmerich Cannot Overcome the Strong Presumption in Favor of Transfer ........ 12

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abid v. Google, Inc.*,
2017 WL 11048805 (M.D.N.C. Oct. 12, 2017) ........ 11

*Atl. Marine Constr. Co. v. U.S. Dist. Court*,
571 U.S. 49 (2013) ........ 2, 7, 13

*Ayala v. Waste Mgmt. of Ariz., Inc.*,
2019 WL 2085106 (S.D. Tex. May 10, 2019) ........ 8

*Bushansky v. Soon-Shiong*,
23 234 Cal. Rptr. 3d 54 (Cal. Ct. App. 2018) ........ 10

*Feldman v. Google, Inc.*,
513 F. Supp. 2d 229 (E.D. Pa. 2007) ........ 11

*Fintech Fund, F.L.P. v. Horne*,
836 F. App'x 215 (5th Cir. Nov. 10, 2020) ........ 8

*Garrett v. Hanson*,
429 F. Supp. 3d 311 (E.D. Tex. 2019) ........ 8

*Harrington v. Pinterest, Inc.*,
2022 WL 4348460 (N.D. Cal. Sept. 19, 2022) ........ 13

*Haynsworth v. The Corp.*,
121 F.3d 956 (5th Cir. 1997) ........ 8, 11, 12

*Helena World Chron., LLC v. Google LLC*,
2026 WL 787882 (D.D.C. Mar. 20, 2026) ........ 3

*In re Google, L.L.C.*,
172 F.4th at 453 ........ 13, 14

*In re Rolls Royce Corp.*,
775 F.3d 671 (5th Cir. 2014) ........ 8

*In re Taxable Mun. Bond Sec. Litig.*,
796 F. Supp. 954 (E.D. La. 1992) ........ 12

*In re Volkswagen of Am., Inc.*,
545 F.3d 304 (5th Cir. 2008) ........ 13

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ....................................................................................13

*Merchs. & Farmers Bank of Kosciusko, Miss. v. State of Miss. ex rel. Moore*,
651 So. 2d 1060 (Miss. 1995)..........................................................................10, 12

*Miller v. Fannin*,
481 So. 2d 261 (Miss. 1985)....................................................................................10

*Moates v. Facebook Inc.*,
2021 WL 3013371 (E.D. Tex. May 14, 2021)..........................................................12, 13

*Olinick v. BMG Entm't*,
42 Cal. Rptr. 3d 268 (Cal. Ct. App. 2006).................................................................10

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ..................................................................................13

*Ray v. Google, LLC*,
2023 WL 7329562 (S.D. Miss. Aug. 18, 2023)......................................................2, 8, 11

*Rojas-Lozano v. Google, Inc.*,
2015 WL 4779245 (D. Mass. Aug. 12, 2015) ...............................................................2, 9

*Sabal Ltd. LP v. Deutsche Bank AG*,
209 F. Supp. 3d 907 (W.D. Tex. 2016)..........................................................................8

*Titan Indem. Co. v. Hood*,
895 So. 2d 138 (Miss. 2004).....................................................................................10

*Tufano v. Google LLC*,
2025 WL 3091513 (M.D. Pa. Nov. 4, 2025), *report and recommendation adopted*, 2025 WL 3634345 (M.D. Pa. Dec. 15, 2025)...............................................2

*Vaz Borralho v. Keydril Co.*,
696 F.2d 379 (5th Cir. 1983) ........................................................................................8

*Weber v. PACT XPP Techs., AG*,
811 F.3d 758 (5th Cir. 2016) ...............................................................................8, 11, 13

*Webseed, Inc. v. Dep't of State*,
2025 WL 996458 (W.D. Tex. Feb. 24, 2025), *report and recommendation adopted*, 2025 WL 993375 (W.D. Tex. Apr. 1, 2025).............................................2, 11

*Williamson Pounders Architects, P.C. v. Tunica Cnty.*,
681 F. Supp. 2d 766 (N.D. Miss. 2008)......................................................................10

**STATUTES**

17 U.S.C. § 107 .......... 3

28 U.S.C. § 1404 .......... 7

## INTRODUCTION

For over a decade, Defendant Google LLC ("Google") has sent visitors to the websites of Plaintiff Emmerich Newspapers, Inc. ("Emmerich") through Google News. Google's service displayed headlines and thumbnail images from Emmerich's sites while providing links directly to those sites, thus driving user traffic to them. Google acted with Emmerich's authorization, and to its substantial benefit. Despite that history, Emmerich now complains that Google's longstanding operations infringe its copyrights. As Google will show, those claims are frivolous. But there is a threshold problem: Emmerich sued in the wrong court.

Emmerich uses a multitude of Google services. In order to do so, it has entered into a series of agreements with Google that make clear that disputes with Google arising out of or relating to Google services generally must be litigated in Northern California. As just one example, Emmerich long ago assented to the Google Terms of Service agreement (the "Google TOS"), which provides that any claim regarding any Google service would be "resolved ***exclusively*** in the federal or state courts of Santa Clara County, California, USA." Declaration of Thomas R. Wakefield ("Wakefield Decl.") Ex. A at 17 (emphasis added). Nevertheless, in suing over the Google News service, Emmerich chose to file in Mississippi.

What makes that choice especially hard to understand is that Emmerich's use of Google services under the Google TOS bears directly on its case. For example, pursuant to the Google TOS, Emmerich used Google's Search Console to instruct Google's automated web crawlers where and how to locate and copy the content of Emmerich's websites so the content could be displayed in Google's search services. That is, through Search Console, Emmerich actually authorized and aided the use of content over which it is now suing. If it really wishes to pursue such a lawsuit, Emmerich must honor its agreement in the Google TOS and do so in California.

Emmerich also agreed to the AdSense Terms of Service ("AdSense TOS"). Under that agreement, Emmerich asked Google to help it generate revenue from the content on its websites by placing advertisements on the sites and referring visitors to them through Google's search services. Again, the agreement sets the exclusive venue for disputes about any of Google's services in California. Yet Emmerich ignored its promise and sued over the Google News service here.

The law is clear that Emmerich must be held to its repeated agreement regarding the venue in which to litigate any disputes regarding Google's services. Courts give "controlling weight in all but the most exceptional cases" to such forum-selection clauses. *Atl. Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 60 (2013). This case is no exception. Indeed, courts around the country have routinely enforced the forum-selection clauses in these very agreements. *See, e.g.*, *Webseed, Inc. v. Dep't of State*, 2025 WL 996458, at *8 (W.D. Tex. Feb. 24, 2025), *report and recommendation adopted*, 2025 WL 993375 (W.D. Tex. Apr. 1, 2025) (granting motion to transfer based on the Google TOS); *Rojas-Lozano v. Google, Inc.*, 2015 WL 4779245, at *4 (D. Mass. Aug. 12, 2015) (same); *Tufano v. Google LLC*, 2025 WL 3091513, at *6 (M.D. Pa. Nov. 4, 2025), *report and recommendation adopted*, 2025 WL 3634345 (M.D. Pa. Dec. 15, 2025) (same); *see also Ray v. Google, LLC*, 2023 WL 7329562, at *7 (S.D. Miss. Aug. 18, 2023) (granting motion to transfer based on AdSense TOS). This Court should do the same and, pursuant to 28 U.S.C. § 1404(a), transfer this case to the Northern District of California.

## FACTUAL BACKGROUND

### I. Emmerich's Allegations

Emmerich is a news publisher that allegedly distributes 25 newspapers across 20 subsidiaries in Arkansas, Mississippi, and Louisiana. Dkt. No. 1 ("Compl.") ¶¶ 8-9. It operates publicly accessible websites where users can view its newspapers and read news stories, some of which include photographs. Compl. ¶¶ 16-17. The Complaint alleges that Emmerich owns these

photographs and that Google infringed copyrights in them by using an automated program to obtain them from Emmerich's websites (a practice known as "web crawling" or simply "crawling") and then displaying thumbnails of them in Google News, a search service that provides story headlines and photo thumbnails as pointers linking back to the full stories and images on newspapers' websites. Compl. ¶¶ 25-26. As Google will show at a later stage of the proceeding, Emmerich's infringement claims are meritless because Emmerich authorized the conduct about which it complains, and regardless, Google made non-infringing fair use of the content under 17 U.S.C. § 107.[1]

## II. Emmerich Has Used Google's Services, Whose Terms of Service Require Disputes to Be Litigated in California.

This is the third lawsuit that Emmerich has filed against Google in recent years.[2] While the Complaint misstates the operation of Google News and misconstrues basic precepts of copyright law, it elides the fact that Emmerich has a wide-ranging business relationship with Google. Google offers an array of free services to third-party websites, and Emmerich used too many of them to count. For instance, to build and operate its news websites, Emmerich used Google Tag Manager,

---

[1] Emmerich further alleges that, in the process of providing this referral traffic, Google removes certain attribution information that Emmerich provides in "gutter credits" and overlays on its photos, thereby violating the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(b). Compl. ¶¶ 29, 32-33. There, too, Emmerich is badly mistaken. As explained in Google's concurrently filed Motion to Dismiss, Google does not acquire photos with the attribution information included, and does not remove any such information, let alone with intent to foment or conceal copyright infringement as required for liability under the DMCA. *See* Dkt. No. 8 at 9-15.

[2] In 2024, Emmerich sued in Washington, D.C. on the theory that Google violated antitrust law by monopolizing the markets for general search services and for online news. *See* Am. Compl., *Helena World Chron., LLC v. Google LLC*, No. 1:23-cv-03677, Dkt. No. 27 (D.D.C. May 13, 2024). That claim was recently dismissed with prejudice. *Helena World Chron., LLC v. Google LLC*, 2026 WL 787882 (D.D.C. Mar. 20, 2026). Separately, in *In re: Google Digital Advertising Antitrust Litigation*, Emmerich joined a multi-district litigation accusing Google of anticompetitive conduct in the online ad tech market. *See* Am. Compl., No. 1:21-md-03010, Dkt. No. 401 (S.D.N.Y. Dec. 2, 2022).

Google Analytics, and Google Fonts, Wakefield Decl. ¶ 4, and to make money by selling ads on its websites, it used Double Click and Ad Manager. *See* Am. Compl. ¶ 60, *In re Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-03010, Dkt. No. 401 (S.D.N.Y. Dec. 2, 2022). It also published mobile applications for its newspapers using the Google Play Store. Wakefield Decl. ¶ 3.

While Google offers these services and others for free, it does so subject to certain conditions that are set out in written agreements with its users. As relevant here, Emmerich—like all other Google users—agreed that any lawsuit arising out of or relating to any of Google's "***services***" must be filed "***exclusively***" in the state or federal courts in Santa Clara County, California. Wakefield Decl. ¶ 6 & Ex. A at 17 (emphasis added). That expansive forum-selection clause appears in both the Google TOS and the AdSense TOS. *See id.* And because this lawsuit is about Google's services, including among others, Google News, Search Console, and AdSense, it belongs in the Northern District of California.

***Google News***: Google News is a part of Google's search services, which also include Google Search, Google Maps, and Google Images, among others. Declaration of Moshe Samet ("Samet Decl.") ¶ 3. Google crawls the internet in search of news content and, if permitted by the website owners, displays the titles of news articles and, sometimes, thumbnails of photographs that accompany the articles. *Id.* ¶ 2. Google News links to the original publication for every headline and thumbnail it displays, so that users can visit the outlet to read the story or view the original image in full size and context. *Id.* ¶ 2. The service is offered to both users and news publishers free of charge, and does not contain any advertisements. *Id.* ¶ 2.

***Search Console.*** Search Console, formerly named Webmaster Tools, is another free service that Google offers to website owners. Samet Decl. ¶ 4. It helps them monitor, enhance, and

control how their sites and content appear in Google's search services, including Google News. *Id.* ¶ 4. Through Search Console, owners can manage Google's crawling and indexing of their sites—and they are free to block those activities entirely. *Id.* ¶ 4. Alternatively, owners can submit sitemaps that affirmatively instruct Google's crawlers on where to find content (*e.g.*, news or images on the websites) for inclusion in Google's search services. *Id.* ¶ 4. Owners are also able to generate reports showing how their sites perform, that is, how often users are referred to them through Google News and other search services. Samet Decl. ¶ 4.

To use Search Console, website owners must have registered a Google account and affirmatively agreed to the Google TOS, and they must verify their ownership of specific websites. *Id.* ¶¶ 4-5. The Google TOS states that "California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules," and that disputes "arising out of or relating to" Google's services "will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA." Wakefield Decl. Ex. A at 17. It also incorporates a list of services that are subject to the Google TOS, including popular services like Google Drive, Gmail, Google Maps, and Google Photos, and specifically lists Search Console as one of the covered services. Wakefield Decl. Ex. B at 13.

None of this is lost on Emmerich. According to its complaint in a separate case, Google "invites Publishers to affirmatively push their content to Google News through the Google Publisher Center and to monitor and optimize traffic and impressions through its Google Search Console." Am. Compl. ¶ 162, *Helena World Chron., LLC v. Google LLC*, No. 1:23-cv-03677, Dkt. No. 27 (D.D.C. May 13, 2024). Emmerich also acknowledged that "using these tools makes publishers subject to Google's Terms of Service." *Id.*

Emmerich went through the account-creation process, affirmatively accepted the Google TOS and the forum-selection clause therein, and registered to use the Search Console service. Samet Decl. ¶¶ 7-10. According to Google's records, every single one of Emmerich's subsidiaries has claimed its domains through Google's Search Console, and identified an email address associated with emmerichnewspapers.com—Emmerich's own website—as a website owner. Samet Decl. ¶¶ 7-8; Wakefield Decl. ¶ 5.[3] Not only that, but Emmerich actively used the Search Console service to manage Google's access to and use of Emmerich's websites. In particular, Emmerich opted to submit sitemaps for at least six of its websites to specifically instruct Google's crawlers on where Google could find the content on Emmerich's sites for purposes of including it in Google's search services, including Google News. Samet Decl. ¶ 11. In other words, Emmerich directed and authorized Google's crawling and use of its website content, activity about which it now complains. The Search Console service and the agreement governing its use will thus be squarely at issue in the case.

***AdSense.*** Emmerich admitted in a prior lawsuit against Google that it has "paid for and used Google's digital publishing products, including . . . Ad Sense." Am. Compl. ¶ 60, *In re Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-03010, Dkt. No. 401 (S.D.N.Y. Dec. 2, 2022). AdSense enables web publishers to earn money by allowing Google to display third-party advertisements on their websites. Declaration of Konstantinos Symeonidis ("Symeonidis Decl.") ¶ 2. Google shares with participating publishers a percentage of the revenues generated through the ads placed on their sites. *Id.* ¶ 2. As all AdSense participants must, Emmerich agreed to the

[3] The email address appears to belong to the Online Network Manager for Emmerich, Brandon Grisham, whom Emmerich identifies as its registered copyright agent under the DMCA—that is, the person responsible for managing claims of copyright infringement for the company. Wakefield Decl. ¶ 5.

AdSense TOS. Symeonidis Decl. ¶¶ 3-5, 7; Wakefield Decl. ¶ 7. It used the service for at least ten of its wholly owned subsidiaries. Symeonidis Decl. ¶ 7; Wakefield Decl. ¶ 7.

Like the Google TOS, the AdSense TOS provides that "[a]ll claims arising out of or relating to the AdSense Terms or the Services . . . will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA." Wakefield Decl. Ex. C at 4-5. "Services" is broadly defined as Google's "search and advertising services," which again encompasses Google News, Google Search, AdSense, and other services. *Id.* at 1. Further, by agreeing to the AdSense TOS, Emmerich expressly "permit[ted] Google to serve . . . links to [its] websites." *Id.* at 5. That is part of what the Google News service does—it uses headlines and thumbnail images as links pointing users back to Emmerich's sites. And again, that is what Emmerich is complaining about in this lawsuit. The AdSense service and the AdSense TOS are thus implicated in the case as well.

**ARGUMENT**

Section 1404(a) provides that "in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The § 1404(a) analysis "changes, however, when the parties' contract contains a valid forum-selection clause." *Atl. Marine*, 571 U.S. at 63. In that scenario, a plaintiff's choice of forum "merits no weight" and "the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* Private-interest considerations fall out of the § 1404(a) analysis, as the plaintiff has "waive[d] the right to challenge the preselected forum as inconvenient or less convenient." *Id.* at 64. And public-interest considerations will defeat transfer to the agreed-upon forum only in the "most unusual cases," given "'the interest of justice' is served by holding parties to their bargain." *Id.* at 66 (quoting 28 U.S.C. § 1404(a)).

In the Fifth Circuit, courts undertake a three-part inquiry to determine whether transfer is required pursuant to a forum-selection clause. *See Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768-76 (5th Cir. 2016). ***First***, looking to state law, courts interpret the contract to determine whether the dispute falls within its scope and whether the forum-selection clause is "mandatory or permissive." *Id.* at 768, 770; *see also Fintech Fund, F.L.P. v. Horne*, 836 F. App'x 215, 226 (5th Cir. Nov. 10, 2020); *Sabal Ltd. LP v. Deutsche Bank AG*, 209 F. Supp. 3d 907, 917-18 (W.D. Tex. 2016). ***Second***, if the dispute is within scope of a mandatory forum-selection clause, courts rely on federal law to decide whether the clause is enforceable. *Weber*, 811 F.3d at 770 (citing *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997). ***Third***, courts assess whether the facts demonstrate "one of the rare cases" in which the public-interest factors overcome the parties' valid and enforceable forum-selection clause. *Id.* at 775-76. This last step in the analysis is typically "easy": "except in a truly exceptional case, the contract controls." *In re Rolls Royce Corp.*, 775 F.3d 671, 679 (5th Cir. 2014). Here, the requisite analysis necessitates transfer to the Northern District of California.[4]

## I. Emmerich's Claims Fall Within the Scope of the Mandatory Forum-Selection Clauses in Google's Agreements.

Google's agreements provide that all disputes "arising out of or relating to" the agreements or Google's services will be resolved "exclusively in the federal or state courts of Santa Clara County, California, USA." Emmerich's claims in this lawsuit concern Google services, including Google News, Search Console, and AdSense. They therefore fall within the heartland of the forum-selection clauses in the agreements—and those clauses are mandatory, as case after case has found.

[4] "In determining [Section 1404(a)] motions, the district court may consider affidavits submitted by both parties, interrogatories, and depositions." *Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 386 (5th Cir. 1983). District courts have consistently applied this rule. *See Ray*, 2023 WL 7329562, at *2; *Garrett v. Hanson*, 429 F. Supp. 3d 311, 317 (E.D. Tex. 2019); *Ayala v. Waste Mgmt. of Ariz., Inc.*, 2019 WL 2085106, at *3 (S.D. Tex. May 10, 2019).

### A. The Claims Are Well Within the Scope of the Agreements.

The forum-selection clauses in the Google TOS and the AdSense TOS (together, the "Agreements") are broad. They cover not just disputes about the agreements themselves, but any disputes arising out of or relating to the Agreements or any of Google's "services." *See Rojas-Lozano*, 2015 WL 4779245, at *4 (granting transfer; "the forum selection clause [in Google's terms of service] is written in broad terms, covering all claims 'arising out of or relating to, [Google's] products or services"). That language readily encompasses Emmerich's case against Google. Emmerich's claims all arise from and relate to Google News, which is indisputably a Google service. The Court need go no further. The case is within the scope of the forum-selection clauses to which Emmerich agreed.

But there are additional reasons why the case is governed by the forum-selection clauses. Emmerich's lawsuit also arises from and relates to its use of Search Console, another Google service. Emmerich's claims are about Google's crawling and indexing of images on Emmerich's websites and Google's display of thumbnail versions of those images on Google News. *See, e.g.*, Compl. ¶ 25. Emmerich directed and authorized that process through Search Console, submitting sitemaps through the service to specifically instruct Google's crawlers where to find content on Emmerich's sites so that Google could use it to refer Google users to those sites. *See* Samet Decl. ¶ 11. Having submitted sitemaps to Google, Emmerich should not be heard to complain about Google using the mapped content. But that is the case Emmerich has brought, and its use of the Search Console service will play a key role in it. Again, Emmerich repeatedly agreed that any case arising out of or relating to that Google service (and any other) would be litigated in California.

Finally, Emmerich's agreement to the AdSense TOS will also figure prominently in this case. Under that agreement, Emmerich authorized Google "to serve . . . links to [Emmerich's] websites." Symeonidis Decl. ¶ 5. Google has done that for years, using thumbnails of photographs

as links directly back to Emmerich's news stories. *Supra* at 6-7. Emmerich cannot retroactively disavow that authorization. But if it wishes to try, it must do so in California, having agreed that any dispute arising out of or relating to the AdSense TOS or Google services would be venued there.

**B. The Forum-Selection Clauses Are Mandatory.**

The forum-selection clauses in the Agreements are "mandatory," not permissive; that is, litigation within the ambit of the clauses can only proceed in the designated forum. Under California law,[5] a forum-selection clause is mandatory if it "contains express language of exclusivity of jurisdiction" and "specif[ies] a mandatory location for litigation." *Olinick v. BMG Entm't*, 42 Cal. Rptr. 3d 268, 274 (Cal. Ct. App. 2006); *see also Bushansky v. Soon-Shiong*, 23 234 Cal. Rptr. 3d 54, 63 (Cal. Ct. App. 2018). The Google TOS states that "all disputes" arising out of or relating to Google services will be "resolved ***exclusively*** in the federal or state courts of Santa Clara County, California." Wakefield Decl. Ex. A at 17 (emphasis added). Similarly, the AdSense TOS requires that "[a]ll claims" arising out of or relating to "the Services"—*i.e.*, Google's "search and advertising services"—"will be litigated ***exclusively*** in the federal or state courts of Santa Clara County, California, USA." Wakefield Decl. Ex. C at 4-5 (emphasis added). Courts within the Fifth Circuit have already found these same clauses mandatory. *See, e.g.*,

[5] The Agreements stipulate that California law applies. *Supra* at 7, 5. As a "general rule," Mississippi "give[s] effect to an express agreement that the laws of a specified jurisdiction shall govern," *Miller v. Fannin*, 481 So. 2d 261, 262 (Miss. 1985), unless doing so violates a fundamental public policy of Mississippi, *Williamson Pounders Architects, P.C. v. Tunica Cnty.*, 681 F. Supp. 2d 766, 770 (N.D. Miss. 2008). Holding the parties to their agreement to apply California law does not violate any Mississippi public policy. *See, e.g.*, *Merchs. & Farmers Bank of Kosciusko, Miss. v. State of Miss. ex rel. Moore*, 651 So. 2d 1060, 1061 (Miss. 1995) (courts are "obligated to enforce a contract executed by legally competent parties where the terms of the contract are clear and unambiguous"). In any event, the result would be the same under Mississippi law. *See, e.g.*, *Titan Indem. Co. v. Hood*, 895 So. 2d 138, 146 (Miss. 2004) (forum-selection clauses are presumptively valid and the word "exclusive" indicates that the clause is mandatory).

*Webseed*, 2025 WL 996458, at *5 (Google TOS "make[s] clear" that the forum-selection clause is mandatory); *Ray*, 2023 WL 7329562, at *3 (forum-selection clause in the AdSense TOS is "unambiguously mandatory"). Proceeding here is thus not permitted.

**II. The Forum-Selection Clauses Are Enforceable.**

The Fifth Circuit "applies a strong presumption" in favor of enforcing mandatory forum-selection clauses. *Weber*, 811 F.3d at 773. To overcome its "heavy burden of proof," *Haynsworth*, 121 F.3d at 963, a plaintiff must show that the forum-selection clause specifically—rather than the contract in its entirety—is invalid. *Weber*, 811 F. 3d at 773-74. It can do so only with a "clear showing" that the clause is "unreasonable" under one of the following exceptions:

> (1) the incorporation of the [forum-selection clause] into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the [clause] would contravene a strong public policy of the forum state.

*Id*. (quoting *Haynsworth*, 121 F.3d at 963). None is present here.

As to the first exception, the forum-selection clauses in the Agreements were not the "product of fraud or overreaching." *Id.* "Fraud and overreaching must be specific to a forum selection clause in order to invalidate it." *Haynsworth*, 121 F.3d at 963. That is, any alleged fraud or overreaching must be "aimed straight at the [forum-selection] clause." *Id.* Far from being procured by fraud or overreach, the forum-selection clauses appear in plain language under bold headings: "**Settling disputes, governing, law, and courts**" in the Google TOS, and "**Governing Law; Venue**" in the AdSense TOS. *Supra* at 5, 7. There is simply no basis for finding that these clauses were somehow procured illicitly. *See, e.g.*, *Abid v. Google, Inc.*, 2017 WL 11048805, at *3 (M.D.N.C. Oct. 12, 2017) (Google's forum-selection clause was not the result of fraud or overreaching); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 246-48 (E.D. Pa. 2007) (same).

The other exceptions are even farther afield. If the action were transferred to the Northern District of California, Emmerich would not be deprived of its "day in court" (the second exception) or of any "remedy" (the third exception). *Haynsworth*, 121 F.3d at 963. Emmerich cannot show that "it is impossible for [Emmerich] to try the case [in the Northern District of California]," such that litigating there "will require [it] to abandon [its] claims." *Moates v. Facebook Inc.*, 2021 WL 3013371, at *5 (E.D. Tex. May 14, 2021). Indeed, Emmerich has previously sued Google outside Mississippi;[6] there is no reason to believe it would be unable to do so again. And there is no difference between Mississippi and California with respect to available remedies, assuming any were warranted. The remedies for Emmerich's copyright claims are governed by federal law and not subject to state-law variation. *Cf. In re Taxable Mun. Bond Sec. Litig.*, 796 F. Supp. 954, 963 (E.D. La. 1992) ("there is ultimately a single proper interpretation of federal law"). Finally, Emmerich cannot show that a "strong public policy" of Mississippi would be contravened by holding Emmerich to its agreement to litigate in California. *Haynsworth*, 121 F.3d at 963. To the contrary, Mississippi has a policy of holding parties to the foreseeable consequences of their agreements. *See, e.g.*, *Merchs. & Farmers Bank of Kosciusko*, 651 So. 2d at 1061 (courts are "obligated to enforce a contract executed by legally competent parties where the terms of the contract are clear and unambiguous") (cleaned up). Consistent with that policy, the Court should hold Emmerich to its Agreements, and transfer this case to California as those Agreements require.

## III. Emmerich Cannot Overcome the Strong Presumption in Favor of Transfer.

The last question for the Court is whether public-interest factors favor transfer. Those factors are: (1) "the familiarity of the forum with the law that will govern the case," (2) "the local

[6] *See* Am. Compl., *Helena World Chron., LLC v. Google LLC*, No. 1:23-cv-03677, Dkt. No. 27 (D.D.C. May 13, 2024); *In re Google Digit. Advert. Antitrust Litig.* No. 1:21-md-03010, Dkt. No. 401 (S.D.N.Y. Dec. 2, 2022).

interest in having localized interests decided at home," and (3) "the administrative difficulties flowing from court congestion."[7] *In re Google, L.L.C.*, 172 F.4th 450, 453 (5th Cir. 2026). Where, as here, there is a valid and enforceable forum-selection clause, "the public-interest factors would outweigh a valid forum clause only in ***truly extraordinary cases***." *Weber*, 811 F.3d at 776 (emphasis added) (citing *Atl. Marine*, 571 U.S. at 64). This case is nothing of the sort. If anything, the public-interest factors favor transfer.

First, as a prominent forum for litigation at the intersection of technology and copyright, California federal courts are extremely familiar with the governing law. *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (search engine's reproduction of images as thumbnails was fair use); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155-56 (9th Cir. 2007) (same as to Google's display of images as thumbnails in search results); *Harrington v. Pinterest, Inc.*, 2022 WL 4348460, at *7 (N.D. Cal. Sept. 19, 2022) (no DMCA violation where Pinterest included links to original website where the images at issue reside). To the extent any contract law questions arise, California courts are especially familiar with the California law that will govern under the choice-of-law clauses in the Agreements. *Cf. Moates*, 2021 WL 3013371, at *10 ("A federal court sitting in California would be more familiar with California law than this Court.").

Second, Emmerich's interests are not localized to this District—again, it bears mentioning that it has repeatedly sued Google outside of Mississippi. *Supra* at 3. Instead, the locus of this dispute is in the Northern District of California, where Google is headquartered; where most Google witnesses reside; and where Google's decisions about operating Google News and the associated web crawling and indexing—the central issues in this case—were made. *See In re*

[7] A fourth factor—"the avoidance of unnecessary problems of conflict of laws or in the application of foreign law"—is not implicated. *In re Google, L.L.C.*, 172 F.4th at 453.

*Volkswagen of Am., Inc.*, 545 F.3d 304, 318-19 (5th Cir. 2008) (the local-interest factor weighed in favor of transfer where witnesses, evidence, and the majority of parties were located in the transfer district).

The third factor—court congestion—is neutral. The median time from filing to disposition of civil cases is 7.5 months in the Northern District of California, compared to 9.1 months in this District, though the median time from filing to trial is longer in the Northern District of California. *See* Fed. Court Mgmt. Statistics–Comparison Within Circuit (Dec. 31, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distcomparison1231.2025.pdf. In any event, the Fifth Circuit has observed that "[t]his factor is a weak signal at best compared to the others." *In re Google, L.L.C.*, 172 F.4th at 453; *see also id.* (noting that this factor is "the most speculative . . . because measuring congestion is easier said than done") (cleaned up). Even in the absence of a forum-selection clause, the Fifth Circuit recently granted mandamus relief to reverse a district court's denial of Google's motion to transfer to the Northern District of California based on court congestion. *See id.* at 545. Transfer is all the more appropriate here, since that is the bargained-for outcome.

## CONCLUSION

Consistent with the forum-selection clauses to which Emmerich repeatedly agreed, Google respectfully requests that the Court transfer this case to the Northern District of California under § 1404(a).

Dated: June 18, 2026.

Respectfully submitted,

*/s/ Chelsea Lewis*

**FORMAN WATKINS & KRUTZ LLP**

CHELSEA C. LEWIS (MSB NO. 105300)
chelsea.lewis@formanwatkins.com
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
Telephone: (601) 960-8600
Facsimile: (601) 960-8613

**WILSON SONSINI GOODRICH & ROSATI PC**

BRIAN M. WILLEN (*pro hac vice* forthcoming)
bwillen@wsgr.com
31 W. 52nd Street, Fifth Floor
New York, New York 10019-6118
Telephone: (212) 999-5800
Facsimile: (866) 974-7329

THOMAS R. WAKEFIELD (*pro hac vice* forthcoming)
twakefield@wsgr.com
One Market Plaza, Spear Tower, Suite 330
San Francisco, California 94105-1126
Telephone: (415) 849-2000
Facsimile: (866) 974-7329

*Counsel for Defendant Google LLC*